# Exhibit A

*This is a redacted version of the original decision. Select details have been removed from the decision to preserve anonymity of the student. The redactions do not affect the substance of the document.*

Pennsylvania

# Special Education Hearing Officer

DECISION

Student's Name:  C. O.

Date of Birth:  [redacted]

ODR No. 13639-12-13-AS

CLOSED HEARING

| Parties to the Hearing: | Representative: |
|---|---|
| Parents | David J. Berney, Esquire<br>Jennifer Y. Sang, Esquire<br>Law Offices of David J.Berney<br>1628 JFK Boulevard, Su. 1000<br>Philadelphia, PA 19103 |
| School District of Philadelphia<br>440 North Broad Street, Su. 313<br>Philadelphia, PA 1913 | Tammy J. Flail, Esquire<br>Levin Legal Group, P.C.<br>1301 Mason's Mill Business Park<br>1800 Byberry Road<br>Huntingdon Valley, PA 19006 |
| Dates of Hearing: | May 24, 2013, July31, 2013,<br>August 9, 2013 |
| Record Closed: | September 4, 2013 |
| Date of Decision: | September 22, 2013 |
| Hearing Officer: | William F. Culleton, Jr., Esq.,CHO |

<u>INTRODUCTION AND PROCEDURAL HISTORY</u>

The Student named in the title page of this decision (Student) is an eligible resident of the school district named in the title page of this decision (District).  (NT 8.)  The District has identified Student with Specific Learning Disability and Speech or Language Impairment.  (NT 7.)  Parents seek tuition reimbursement, having placed Student in a private school (School) unilaterally.  (NT 42.)  In addition, Parents request compensatory education from September 21, 2012 through October 31, 2012.  Parents assert that the District has failed to offer or provide to the Student a free appropriate public education (FAPE), as required by the Individuals with Disabilities Education Act, 20 <u>U.S.C</u>. §1401 <u>et</u> <u>seq</u>. (IDEA), and the Vocational Rehabilitation Act of 1973, 29 <u>U. S. C</u>. §794 <u>et</u> <u>seq</u>.[1]

The District raises three defenses: first, that the District offered appropriate services; second, that the placement chosen by the Parents was inappropriate; and third, that tuition reimbursement should be barred on equitable grounds because the Parents did not give the District sufficient time to make an appropriate offer of services.

The hearing was concluded in three sessions.  The parties submitted written summations, and the record closed upon receipt of those summations.

---

[1] Parents also asserted a derivative claim under the Americans with Disabilities Act, 42 <u>U. S. C</u>. §12101 <u>et</u> <u>seq</u>. (ADA).  20 <u>U. S. C</u>. § 1415(l)(requiring exhaustion of administrative remedies before bringing court action under ADA).  <u>See</u>, <u>Swope v. Central York Sch. Dist</u>., 796 F. Supp.2d 592, 600-601 (M.D. Pa. 2011)(holding that special education hearing officers have jurisdiction to decide derivative ADA claims where the relief sought is equally available under the IDEA); <u>Batchelor v. Rose Tree Media Sch. Dist.</u>, 2013 U. S. Dist. Lexis 44250 at 21 to 31 (E. D. Pa. 2013)(holding that exhaustion requirement applies to ADA claims, citing IDEA's "comprehensive remedial framework").  "Derivative" in this context means claims that are "concurrent with" IDEA claims – that is, only claims that arise entirely out of facts also cognizable under the IDEA, and that can be remedied under the IDEA. <u>Swope</u>, 796 F.Supp.2d at 600-601.  In a pretrial ruling, I concluded that the IDEA vests jurisdiction in special education hearing officers to such claims.

<u>ISSUES</u>

1. During the period from September 21, 2012 to October 31, 2012, did the District fail to offer to, or provide Student with, a FAPE, in violation of the IDEA, section 504 and the ADA?

2. Was the private placement selected by Parents appropriate?

3. Should the hearing officer, exercising statutory and equitable authority, order the District to reimburse Parents for private school tuition for the 2012-2013 school year?

4. Should the hearing officer order the District to provide compensatory education to Student for all or any part of the period from September 21, 2012 to October 31, 2012, in addition to tuition reimbursement?

5. If tuition reimbursement is denied, should the hearing officer order the District to provide compensatory education to Student for all or any part of the period from November 1, 2012 to the end of the 2012-2013 school year?


<u>FINDINGS OF FACT</u>

1. Before coming to the District, Student attended parochial schools in kindergarten and first grade.  Student repeated 1st grade and parochial school.  Student came to the District for second grade, the 2007 – 2008 school year. (NT 71-72; P 16; S 9.)

2. In November 2007, the District conducted an evaluation, which determined that Student was a child with a disability as defined by the IDEA, and recommended special education.  (P 16; S 9.)

3. The November 2007 evaluation included cognitive testing.  Student's full scale IQ on the Wechsler Intelligence Scale for Children – Fourth Edition (WISC-IV) was in the below average range.   The November 2007 WISC-IV index scores varied significantly.  Student's verbal reasoning abilities were low average and borderline. Student's nonverbal reasoning abilities were within the average range.   Student's working memory was low average, and Student's processing speed was within the average range.  (P 16; S 9.)

4. In November 2007, Student's word reading skills were extremely low, as were Student's reading comprehension skills.  Student's word decoding skills were all in the low range.  Student's spelling was in the extremely low range, as were Student's written expression skills.   These test scores indicated significant phonological processing difficulties, and need for intensive educational supports and intervention, including direct, explicit, multisensory instruction in "the complete scope and sequence of synthetic phonics."   The evaluation report explicitly listed the Wilson reading program and other programs using Orton– Gillingham approaches.  Student

also needed direct instruction in reading comprehension strategies.  Student also needed spelling instruction linked to word decoding skill instruction.  (P 16; S 9.)

5.  In November 2007, Student's mathematics calculation was low average, and Student's math reasoning or problem-solving skill was low average.  (P 16; S 9.)

6.  In November 2007, Student's listening comprehension skills fell within low average limits, and Student's oral expression skills were average.  (P 16; S 9.)

7.  The District provided an individualized education program (IEP) in November 2007. The IEP team placed Student in resource level learning support and provided to goals targeting reading vocabulary development and oral reading fluency. The goals also targeted basic writing skill development.  (S 9.)

8.  The District re-evaluated Student in March 2012, when Student was in 6th grade. The evaluation report determined that Student was a child with a disability under the IDEA, and was in need of specially designed instruction.  The report noted that Student continued to have difficulty in reading and writing, with mathematics skills within the low end of the average range.  (S 11.)

9.  In March 2012, a brief cognitive assessment test (the Kauffman Brief Intelligence Test-2d Edition (KBIT-II)) found that Student's cognitive abilities were within the low average range, consistent with the District's previous assessment in November 2007.  (S 11.)

10.  The March 2012 re-evaluation found that Student was in the .5 percentile for reading, the 16th percentile for mathematics, and the 6th percentile for writing.  Thus, Student continued to perform at extremely low levels in reading, low or borderline levels in writing and low average levels in mathematics.  Student was falling behind in mathematics.  (NT 809-811; S 9, 11.)

11.  In May 2012, the District re-evaluated Student for purposes of a speech and language evaluation.  The reevaluation found that Student was in need of speech/language support to improve speech production and language skills.  Student displayed moderate articulation impairment, characterized by distortions of the initial r and r–controlled vowel sounds.  Language skill needs included difficulty with syntax and sentence structure.  An auditory processing test was administered, revealing moderate impairment of auditory skills.  (S 12.)

12.  Achievement testing in April 2012 indicated difficulties related to sight vocabulary, decoding, encoding, comprehension and written expression.  Student's grade level for reading overall was 2.5.  For sight word vocabulary, it was 2.2.  For word attack, it was 3.8.  For word comprehension it was 3.3.  For passage comprehension it was 2.8. Student's reading fluency was reported as "less than 70 correct words per minute."  Testing by the District and by an independent evaluator with consistent findings revealed little progress in reading relative to Student's cognitive abilities. (NT 673-674, 736-737, 753-758, 811-812; P 57, 61; S 8, 12.)

13.  In a test of language development, Student's percentile ranks ranged from 3 to 13, with particular weakness in expressive language and syntax.  (S 12.)

14.  The May 2012 re–evaluation recommended increasing the time in which Student received support in the resource room for reading and mathematics.  (S 12.)

15.  In June 2012, the District provided an IEP that placed Student in supplemental learning support, with speech and language therapy.  (S 13, 15.)

16.  The June 2012 IEP provided statewide and local testing accommodations that included reading of questions and decoding of words for non-reading tests.  (S 13, 15.)

17.  The June 2012 IEP provided a reading goal of 90 correct words per minute, based on a baseline of "less than 70 words correct per minute".  The goal included answering correctly questions related to material read for the fluency assessment.  The goal did not specify how many questions, nor was it specific regarding the degree of proficiency or amount of prompting that would be measured.  The goal did not specify the reading grade level at which either the fluency or comprehension assessments would be performed, although it was understood by school staff that the baseline was the overall reading score in the present levels.  It referred to a research based reading intervention curriculum and assessment without referring to the instructional level at which Student was to be assessed within that curriculum.  (NT 869-871; S 13, 15.)

18.  The June 2012 IEP did not provide goals for sight word vocabulary, decoding or word comprehension.  It did not address all of Student's needs with regard to reading. (NT 727-734; 869-878.)

19.  A June 2012 short-term objective for reading called for reading 3 sentences, numbering sentences to show the correct order of events, and writing sentences in the correct order.  It did not describe the grade level or length or syntactic composition of the sentences, the level within the research based program at which assessments would be made, or the level of prompting to be measured.  (S 13, 15.)

20.  A second June 2012 short-term objective for reading called for identifying the main idea of a selection within a time limit.  It specified "Mastery Tests" but did not indicate either the grade level or curricular level at which assessment would be performed.  It did not indicate the level of prompting at which assessment would be done.  (S 13, 15.)

21.  A third June 2012 short-term objective for reading called for reading "at least one more new word per minute and answer comprehension questions about the story [Student] has read and write the answers … ."  This did not specify grade level or curriculum level, nor did it indicate the time period within which Student would be expected to increase fluency by one new word per minute.  (S 13, 15.)

4

22.   The June 2012 IEP called for modifications and specially designed instruction (SDI) including "small group testing", extended time, "multiple testing sessions", simplified directions, scheduled breaks, use of highlighters and highlighter tape, and reducing distraction to the Student.  (S 13, 15.)

23.   The June 12, 2012 IEP did not have goals for decoding, encoding, spelling or writing. (NT 286-287, 299-300; P 56.)

24.   The June 2012 IEP provided a goal for mathematics calculation at the 6th grade level, to be assessed by the Keymath Diagnostic.  Short-term objectives included adding, subtracting, multiplying, and dividing multi-digit numbers, with or without trading.  Another objective called for solving multi-step word problems which require discriminating between the needed and the unnecessary facts presented.  While present levels were stated in grade equivalent terms, various grade equivalents were given from standardized testing for various mathematics skills, so that baselines for the goal and objectives could not be identified.  While "multi-digit" numbers and "multi-step" problems were referenced, the goal and objectives did not specify the numbers of digits or steps to be instructed or learned.  (S 13, 15.)

25.   Mathematics modifications and specially designed instruction included testing accommodations.   Two such accommodations were reading of questions and decoding of words.  Accommodations also included extended time, scheduled breaks and use of a calculator.   Accommodations also included a setting to reduce distraction.  (S 13, 15.)

26.   The June 2012 IEP provided speech and language goals addressing Student's articulation problem and language skills.  The latter goal addressed auditory memory for information including contextual details and facts, rote academic sequences such as counting and poems, and both listening and expressive language.   Short-term goals included memorizing poems or rhymes, without indicating the grade level or complexity of the poems or rhymes.  Another objective was to repeat related words from a spoken list, 26 words of varying length from a baseline of 3.  Another goal was to recall details and correctly answer basic fact questions about spoken sentences.  This did not appear to have either a numerical goal or a baseline, except that it specified a level of mastery (80%).  Specially designed instruction and modifications included "develop semantic awareness" and teaching visual imagery.  (S 13, 15.)

27.   The speech and language IEP goals and specially designed instruction did not provide a systematic approach to sentence and story comprehension.  (P 58; S 13, 15.)

28.   The June 2012 IEP also provided modifications and specially designed instruction including graphic organizers, flashcards and talking about a story after reading it. These also called for linking spelling instruction to word decoding skills instruction. (S 13, 15.)

29.   The June 2012 IEP provided for 900 minutes per IEP term of speech and language therapy in a group of "2 or more", outside of the regular education classroom.  It also

5

called for speech therapist consultation with classroom and special education teachers for 120 minutes per IEP term.  (S 13, 15.)

30.  In the summer of 2012, in the course of a due process proceeding that was settled in September 2012, Parents obtained a private psychoeducational report and a private speech and language evaluation.  Parents received the speech and language evaluation on or about September 7, 2012 and the psychoeducational report on or about September 17, 2012.  (NT 76-78; P 48 p. 10; 58, 59.)

31.  The District re-issued the June 2012 IEP with some minor changes.  On September 5, 2012, Student's Father signed the Notice of Recommended Educational Placement (NOREP) for the June 2012 IEP as amended, indicating agreement, but added a note: "I am signing this so that services will begin for [Student] but I do not agree that this is sufficient or appropriate."  (S 13 p. 36.)

32.  For the beginning of seventh grade (2012-2013 school year), Student transferred from Student's neighborhood school to a neighborhood middle school in the District.  Parents cooperated with that transfer and attempted to facilitate bus transportation and IEP implementation.  (P 72.)

33.  The District conveyed Student's June 12, 2012 IEP, as revised, to the middle school.  (NT 285.)

34.  On or about September 13, 2012, Parents found out that the Student was not receiving the same support in Student's class of 36 children that had been provided in elementary school.  Consequently, Parent asked for a meeting to discuss implementation of Student's IEP at the middle school.  On September 24, 2012, Parents received a response from the District's special education liaison proposing a meeting on October 1 or 2, but Parents did not respond right away.  (NT 75, 89-91; P 48 p. 4, 8-10.)

35.  The liaison is responsible for assuring District compliance with its obligations under the IDEA and state regulations.  (NT 293.)

36.  Parents' attorneys sent the reports of the private psychoeducational evaluation and the private speech and language evaluation to the District in mid-September 2012.  (NT 76-78; P 48 p. 10; 58, 59.)

37.  On or about October 1, 2012, Student brought home a note implying that Student had been chided for not following directions and receiving a low mark in a writing assignment.  Parent became concerned that the middle school teachers were not following Student's IEP or providing supports in language arts instruction.  Parents notified the middle school special education liaison, who spoke to the teacher and requested dates from Parents.  Parents indicated an inability to meet for two weeks and the parties arranged a meeting for October 16, 2012.  (NT 75-P 48 p. 8 to 11.)

38.  At some time prior to October 4, 2012, Parents' attorney referred Parents to the School.  (NT 73-74; P 2.)

39. On October 4, 2012, Parents applied for Student's admission to the School by signing an application form, providing a security deposit and entering into an application process that includes on-site visits and interviews, providing documents, and achievement and curriculum based testing of Student.  (P 2.)

40. October 9, 2012, Parents sent the reports of the private psychoeducational evaluation and the private speech and language evaluation to the middle school.  (NT 76-78; P 48 p. 10; 58, 59.)

41. On October 10, 2012, Parents sent a letter to the principal of the Student's District middle school, notifying the District that they were planning to withdraw Student from the District in ten days and place Student at a private school unilaterally, and requesting tuition reimbursement from the District.  The letter, received no later than October 25, 2012, declared that the Parents considered the prevailing (June 2012) IEP inadequate and that the District's IEP was not meeting Student's needs.  The letter asserted a list of specific deficiencies in the District's services.  (NT 78-79; S 19, 23.)

42. On October 16, 2012, Parents attended a meeting with District staff to discuss Parents' disagreements with District services.  Parents indicated that Student's cognitive abilities and academic levels had not improved while Student was at the District.   Parents expressed concern that Student was not being pulled out of co-taught classes with general education students for small group instruction, that Student's reading achievement was well below the grade level at which the these classes were being taught, that Student was not progressing quickly enough in reading achievement, and that they were concerned about Student's retention of reading skills.  Parents indicated that Student continued to have difficulty spelling sight words and decoding 3 to 4 syllable words.   Parents discussed Student's needs for accommodation with regard to Student's auditory discrimination disability.  At the meeting, there was discussion about rescheduling Student's participation in the Lexia computer-based program.  An IEP meeting was scheduled for November 5, 2012.  (S 18, 20.)

43. The Parents understood that the District was offering to place Student in a smaller learning resource classroom which had 18 students, and that the curricular level of instruction would be at a median level for the students, who represented a wide spread in achievement and reading levels.  Parents also understood that the District was recommending that Student learn to use voice to text software for at least some written assignments, and continue to use a computer-based reading program called Lexia that Student had used in grade school, and that Student found frustrating.  Lexia programming was to be provided in the school library.  (NT 79-82.)

44. Lexia is not direct, explicit instruction in a small group setting.  It is a computer-based intervention that is multisensory.  It is designed so that a teacher can work in conjunction with the computer lessons; however, because the computer program was not fully installed at the middle school, Student worked on it alone during advisory period, and the teacher did not work on it with Student.  (NT 698-701, 727-731, 831, 839, 859-863.)

45. After the October 16 meeting, Parents took Student to a doctor due to symptoms of anxiety and Student's worries about being expected to read materials that were too hard for Student.  (P 48.)

46. At Parents' request due to concerns over Student's symptoms of anxiety, the next scheduled IEP meeting was moved up to October 22, 2012.  Student's mother attended, and expressed concern that Student was falling behind in mathematics and becoming worried about other students noticing.  Student's mother indicated a desire for a more restrictive setting, and asked what options the school could offer if Student remained.   Student's mother expressed concern that Student was experiencing increased anxiety, and that behavioral goals would be needed for that.  (NT 83; P 48; S 21.)

47. At the October 22, 2012 meeting, the District's assigned special education liaison asked Parents why the District should take the time and trouble to present a new IEP if Parents planned to place Student at a private school.  Parents had the impression that the District did not make sufficient effort to propose changes in the IEP to address Parents' concerns.  (NT 83-84, 261-263; S 23.)

48. At the October 22, 2012 meeting, the District presented a proposed new IEP to Parents, dated October 22, 2012.  The IEP placed Student in supplemental learning support and provided for speech and language services, with speech and language.  ESY services were offered as in previous IEPs.  (NT 86; S 16.)

49. Parents concluded that the new IEP did not address Parents' concerns as expressed in the October 22 meeting.  (NT 85; P 48.)

50. The new IEP presented no additional present levels of academic functioning.  It removed a statement from the June 2012 IEP that had indicated "some progress in the general education curriculum", and replaced it with a statement that Student "has a difficult time progressing in the general education curriculum, in reading and math unless [Student's] assignments are modified to [Student's] instructional level."  (S 16.)

51. The new IEP provided one transition service.  It provided for assisting Student to determine a post-secondary major or program of study, once during the IEP duration.  No other service was provided.  Specially designed instruction was not provided.  (S 16.)

52. The new IEP continued accommodations for testing, including reading questions and decoding words. (S 16.)

53. The new IEP continued the reading intervention program referred to in the previous IEP.  Goals and objectives remained unchanged, as did the modifications and specially designed instruction.  (P 56; S 16.)

54. The new IEP provided a mathematics goal.  The present levels of achievement remained the same as in the previous IEP.  The goal was changed.  The new goal did

8

not refer to a 6th grade level of mathematics competence, as the previous goal had done.  The new goal did not refer to a specific mathematics diagnostic instrument for progress measuring.  The new goal reduced the measurement of proficiency from 90% to 80%.  The new goal did not refer to the Corrective Math program as a modified curriculum.  The new goal did not specify an objective for achievement in division, addition or subtraction.  It did specify an objective for achievement in multiplication: "accurately and independently multiply 2 and 3 digit problems".  Another new objective called for answering "random open 'fact' problems using the multiplication tables."  The new IEP did not provide small-group testing as specially designed instruction.  Extended time was not offered on a scheduled basis, but was offered on a Student-requested basis.  A new modification was testing in a separate room.  Reducing distraction and use of a calculator, as well as scheduled breaks were continued in the specially designed instruction.  Reading of questions and decoding of words were also continued.  (S 16.)

55. The new IEP did not offer needed specific supplementary aids and services for the purpose of allowing Student to access the seventh grade curriculum for science and social studies.  (NT 752; S 16.)

56. The first speech and language goal remained essentially the same.  The first and second objectives were essentially the same.  The second and third objectives were amended to set higher levels of performance.  Two new specially designed instruction methods were added.  (S 16.)

57. The second speech and language goal was essentially unchanged.  The short-term objectives were amended to make mastery criteria clearer.  A third objective was changed to address retelling of stories in logical sequence with sufficient details.  (S 16.)

58. A third speech and language goal was added, addressing verbal expression skills, with short term objectives addressing labeling and similarities and differences.  Specially designed instruction included providing keywords, graphic organizers and attribute charts, as well as modeling and visual cues, wait time and practice of skills.  (S 16.)

59. A postsecondary transition goal was added, providing for a computer-based career survey to make student aware of vocational interests.  Short-term objectives were provided, directed to this goal.  (S 16.)

60. Speech and language therapy minutes were increased to 1000 minutes per IEP term.  Consultation time was increased to "entire school day."  (S 15, 16.)

61. Extended school year services were continued in the revised IEP.  (S 16.)

62. The District reported to the state in the proposed new IEP that the amount of time Student would spend in the regular classroom per day was reduced by 4.74 hours per day to 1.98 hours per day.  (S 16.)

63. The IEP did not provide a clear description of how progress would be monitored or reported, and Parents were not aware of how that would be performed. The District's computer based progress data system led to loss of progress data regarding Student, and Parents never had access to that data. (NT 686-689, 885-893, 906; S 13, 15, 16.)

64. On October 25, 2012, Parents sent a letter in which Parents acknowledged receipt of the post-October 22 proposal, and indicated that Parents desired further changes, including incorporating the recommendations in two private evaluation reports provided previously to the District; measureable IEP goals aligned with state standards; accommodations discussed at the October 16 meeting; and speech and language services twice a week in small group for 30 minutes per session. (S 22.)

65. On October 31, 2012, Parents received a new District reevaluation report that was based upon a review of two private evaluation reports previously provided to the District. The transmittal email message from the District's special education liaison stated that the District could not provide an IEP "until you agree with this document." Parents had not been offered a Permission to Evaluate form. (NT 87, 283; P 48 p. 26; S 8, 23.)

66. The October 31 reevaluation report reflected an intention to amend the offered October 22, 2012 IEP to incorporate "key elements" from the private speech and language evaluation. It indicated that new goals would be added to address "other skills such as" vocabulary skills, grammar skills, creating more complex sentences, similarities and differences and retelling stories with sufficient detail and correct sequencing. The evaluation report also expressed the intention to change the formulation of the speech and language goals in the IEP, by incorporating state curriculum standards, and by adding at least some specially designed instruction or accommodations as recommended by the private speech and language evaluation. (S 23.)

67. The October 31 reevaluation report criticized the private psychoeducational report that had been provided to the District. It indicated that the District would not incorporate any of the private psychoeducational report's recommendations into the IEP. (S 8.)

68. The reevaluation report made reference to the Student's "extremely poor rate of academic progress over the past 3 – 4 years." It indicated that Student had needs with regard to decoding, encoding, comprehension and written expression. It stated, "[i]ncreasing the time [Student] gets support in the resource room will benefit [Student]" and it concluded that Student "requires more time in the resource room for intensive support in reading and math." (S 8.)

69. The October 31 reevaluation report indicated that Student has poor auditory discrimination, and recommended that Parents seek evaluation for this processing deficit. It recommended breaking down verbal instructions into smaller steps and restating instructions. It also recommended additional time and modified homework and assignments. (S 8.)

70.  The October 31 reevaluation report recommended "reading strategies which focus primarily or exclusively on visual associations (not verbal or auditory)… ."   It recommended that interventions "that rely on quick and wrote auditory processing skills" would not be a good cognitive fit for Student.  These would include Corrective Reading and Books on Tape.  (S 8.)

71.  The October 31 reevaluation report recognized Parents' report that Student was experiencing anxiety.  It recommended that Parents be referred to mental health or counseling services in the community, that Student join extracurricular activities, and that school work and homework assignments be given to Student "at levels consistent with [Student's] current academic abilities."  (S 8.)

72.  Parents did not agree with the District's reevaluation report because much of what it recommended, including placement in co-taught general education and Lexia for reading, was programming that had failed for five years to help Student learn to read.  (NT 87-89.)

73.  There is no support in the literature for the validity of combining elements of the reading programs that would have been offered to Parents in combination.  (NT 722-723.)

74.  The approach to teaching reading to Student that the District proposed would have de-emphasized the teaching of decoding skills prematurely.  (NT 513-520, 724-728, 766-768; P 56, 57.)

75.  In its IEPs, the District did not offer appropriate instruction in writing to Student. The curriculum included instruction in writing, but the IEPs did not provide present levels or goals, and did not address the need to coordinate writing instruction with instruction in decoding and encoding that Student needed.   (NT 728-729; P 56; S 13, 15, 16.)

76.  On November 1, 2012, Parents advised the District that they had withdrawn Student from the District and placing Student in a private school. (P 48 p. 27; S 23.)

77.  Parents signed a contract for tuition at the School on November 17, 2012. (P 3.)

78.  Parents enrolled Student in private school because the offered IEPs offered many of the same services that had failed to teach Student to read, because the District had not offered an IEP that Parents considered appropriate, because they believed that the District would not offer a different IEP unless and until Parents agreed with the October 31, 2012 District reevaluation report, and because Student was experiencing anxiety due to the District's failure to implement the Student's IEP with fidelity at the middle school.  (NT 87- 94, 166, 190-191, 192-194; P 48 p. 26.)

79.  Parents enrolled Student in a private school (School) that accepts elementary and middle school students and specializes in educating students with language based learning disabilities, including auditory processing disorders.  (NT 71; P 2, 3;S 23.)

80.  The School does not provide IEPs for its students, but it does offer individualized planning and delivery of special education services that are appropriate for Student's needs.  (NT 16-20, 520-528, 541-544, 706-707, 727, 764-769, 816; P 6-9, 56.)

81.  While at the School, Student's rate of progress in reading, writing and mathematics was appropriate.  (NT 521-3, 526, 761-762, 767-771, 777-779; P 4, 8, 56.)

## DISCUSSION AND CONCLUSIONS OF LAW

BURDEN OF PROOF

The burden of proof is composed of two considerations, the burden of going forward and the burden of persuasion.  Of these, the more essential consideration is the burden of persuasion, which determines which of two contending parties must bear the risk of failing to convince the finder of fact.[2]  In Schaffer v. Weast, 546 U.S. 49, 126 S.Ct. 528, 163 L.Ed.2d 387 (2005), the United States Supreme Court held that the burden of persuasion is on the party that requests relief in an IDEA case.  Thus, the moving party must produce a preponderance of evidence[3] that the moving party is entitled to the relief requested in the Complaint Notice.  L.E. v. Ramsey Board of Education, 435 F.3d 384, 392 (3d Cir. 2006)

This rule can decide the issue when neither side produces a preponderance of evidence – when the evidence on each side has equal weight, which the Supreme Court in Schaffer called "equipoise".  On the other hand, whenever the evidence is preponderant (i.e., there is weightier

---

[2] The other consideration, the burden of going forward, simply determines which party must present its evidence first, a matter that is within the discretion of the tribunal or finder of fact (which in this matter is the hearing officer).

[3] A "preponderance" of evidence is a weight of evidence that is greater than the weight of evidence produced by the opposing party.  See, Comm. v. Williams, 532 Pa. 265, 284-286 (1992).  Weight is based upon the persuasiveness of the evidence, not simply quantity.  Comm. v. Walsh, 2013 Pa. Commw. Unpub. LEXIS 164.

evidence) in favor of one party, that party will prevail, regardless of who has the burden of persuasion.  See Schaffer, above.

In the present matter, based upon the above rules, the burden of persuasion rests upon the Parents, who initiated the due process proceeding.  If the Parents fail to produce a preponderance of the evidence in support of Parents' claims, or if the evidence is in "equipoise", the Parents cannot prevail.


TUITION REIMBURSEMENT

Although the parent is always free to decide upon the program and placement that he or she believes will best meet the student's needs, public funding for that choice is available only under limited circumstances.  The United States Supreme Court has established a three part test to determine whether or not a school district is obligated to fund such a private placement[4]. Burlington School Committee v. Department of Education of Massachusetts, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985).  First, was the district's program legally adequate?  Second, is the parents' proposed placement appropriate?  Third, would it be equitable and fair to require the district to pay?  The second and third tests need be determined only if the first is resolved against the school district.  See also, Florence County School District v. Carter, 510 U.S. 7, 15, 114 S. Ct. 361, 366, 126 L. Ed. 2d 284 (1993); Lauren W. v. DeFlaminis, 480 F.3d 259 (3rd Cir. 2007).

_____

[4] The weight of judicial authority in this Circuit holds that tuition reimbursement is available under section 504, and that the Burlington-Carter tests are equally applicable to section 504 claims for tuition reimbursement.  See, 34 C.F.R. §103.33(c)(4); Lauren G. v. West Chester Area Sch. Dist., 906 F.Supp.2d 375, 390-391(E.D. Pa. 2012). Therefore, I so conclude.  It follows that the ADA provides the same remedy.  42 U.S.C. §12133 (providing same "remedies, procedures and rights" for ADA claims as are available under section 504).  See, Jeremy H. v. Mount Lebanon Sch. Dist., 95 F.3d 272, 279 (3d Cir. 1996), overruled on other grounds, A.W. v. Jersey City Pub. Sch., 486 F.3d 791 (2007)(allowing ADA claim for same remedies as available under section 504).

FIRST PART OF THE BURLINGTON-CARTER TEST: FAILURE TO OFFER OR PROVIDE A FAPE

    The IDEA requires that a state receiving federal education funding provide a "free appropriate public education" (FAPE) to disabled children. 20 U.S.C. §1412(a)(1), 20 U.S.C. §1401(9).  School districts provide a FAPE by designing and administering a program of individualized instruction that is set forth in an Individualized Education Plan ("IEP").   20 U.S.C. § 1414(d).  The IEP must be "reasonably calculated" to enable the child to receive "meaningful educational benefits" in light of the student's "intellectual potential."  Shore Reg'l High Sch. Bd. of Ed. v. P.S., 381 F.3d 194, 198 (3d Cir. 2004) (quoting Polk v. Cent. Susquehanna Intermediate Unit 16, 853 F.2d 171, 182-85 (3d Cir.1988)); Mary Courtney T.  v. School District of Philadelphia, 575 F.3d 235, 240 (3rd Cir. 2009), see Souderton Area School Dist. v. J.H., Slip. Op. No. 09-1759, 2009 WL 3683786 (3d Cir. 2009).

    "Meaningful benefit" means that an eligible child's program affords him or her the opportunity for "significant learning."  Ridgewood Board of Education v. N.E., 172 F.3d 238, 247 (3d Cir. 1999).  In order to provide FAPE, the child's IEP must specify educational instruction designed to meet his/her unique needs and must be accompanied by such services as are necessary to permit the child to benefit from the instruction.  Board of Education v. Rowley, 458 U.S. 176, 181-82, 102 S.Ct. 3034, 1038, 73 L.Ed.2d 690 (1982); Oberti v. Board of Education, 995 F.2d 1204, 1213 (3d Cir. 1993).  An eligible student is denied FAPE if his or her program is not likely to produce progress, or if the program affords the child only a "trivial" or "de minimis" educational benefit.  M.C. v. Central Regional School District, 81 F.3d 389, 396 (3rd Cir. 1996), cert. den. 117 S. Ct. 176 (1996); Polk v. Central Susquehanna Intermediate Unit 16, 853 F. 2d 171 (3rd Cir. 1988).

Under the Supreme Court's interpretation of the IDEA in <u>Rowley</u> and other relevant cases, however, a school district is not necessarily required to provide the best possible program to a student, or to maximize the student's potential.  Rather, an IEP must provide a "basic floor of opportunity" – it is not required to provide the "optimal level of services."  <u>Mary Courtney T. v. School District of Philadelphia</u>, 575 F.3d at 251; <u>Carlisle Area School District v. Scott P.</u>, 62 F.3d 520, 532 (3d Cir. 1995).

The law requires only that the plan and its execution were reasonably calculated to provide meaningful benefit.  <u>Carlisle Area School v. Scott P.</u>, 62 F.3d 520,  (3d Cir. 1995), <u>cert</u>. <u>den</u>. 517 U.S. 1135, 116 S.Ct. 1419, 134 L.Ed.2d 544(1996)(appropriateness is to be judged prospectively, so that lack of progress does not in and of itself render an IEP inappropriate.)  Its appropriateness must be determined as of the time it was made, and the reasonableness of the school district's offered program should be judged only on the basis of the evidence known to the school district at the time at which the offer was made.  <u>D.S. v. Bayonne Board of Education</u>, 602 F.3d 553, 564-65 (3d Cir. 2010).[5]


PROVISION OF A FAPE TO STUDENT AS DEFINED BY THE IDEA

The first step in deciding whether or not the District must either provide compensatory education or pay tuition reimbursement is to determine whether or not the District offered a FAPE to Student before the Parents unilaterally enrolled Student in the private school.

---

[5] Section 504 and the ADA define FAPE differently, requiring that the education provided be designed to meet the individual needs of the child "as adequately as the needs of non-handicapped persons are met."  34 <u>C.F.R.</u> §104.33(b)(1).  The same elements must be proved for claims pursuant to the ADA.  42 <u>U.S.C.</u> §12132; <u>see</u>, <u>D.E. v. Cent. Dauphin Sch. Dist.</u>, 2013 U.S. Dist. Lexis 626 at 14 to 31 (M.D. Pa. 2013)(both section 504 and the ADA claims require proofs in addition to evidence that a district failed to provide a FAPE as defined in the IDEA).  I conclude that if Parents can meet the Burlington-Carter three part test (including that the District failed to offer Student a FAPE under the IDEA), then an additional analysis will be required to determine whether or not section 504 and the ADA were violated, based upon the same facts adduced in support of the IDEA violation.

I review the last offered IEP to determine whether or not that document was reasonably calculated to provide Student with meaningful educational benefits at the time at which the IEP was offered.  D.S. v. Bayonne Bd. Of Educ., 602 F.3d 553, 565-565 (3d Cir. 2010).  Thus, the determination must be made on the basis of facts known or available to the parties at the time that the IEP was offered.  See R.E. v. New York City Dept. of Educ., 694 F.3d 167, 185-187 (2d Cir. 2012).  This is especially important in the present matter, where Parents were required to make a decision about the wellbeing of their child based upon the IEP; this was the only written promise to them, and they could not be assured that any unwritten promises substantially deviating from those made in the IEP would be either honored or enforceable.  Ibid.  Guided by the above authority, I will not in effect amend what is written in the IEP retrospectively by relying upon additional promises at the hearing or explanatory evidence that promises materially different services than what the written IEP offered at the time it was delivered to Parents.  I will determine on the record what Parents reasonably knew or should have known was being offered by the District.

The District seeks to limit the time period relevant to this factual issue by arguing that I may consider only acts or omissions subsequent to the date of a settlement agreement that the District asserts was entered into on September 20, 2012.  (NT 24.)  However, I have no jurisdiction to construe the terms of any such agreement.  J.K. v. Council Rock School District, 833 F.Supp.2d 436, 448-449, 450 (E.D. Pa. 2011).  Consequently, I am not free to limit my perusal of the history of this matter based upon the settlement agreement asserted in this matter, and I will consider facts that occurred prior to the date of the asserted agreement, to the extent that they may be relevant.  (NT 21-39.)

16

I conclude that the District failed to offer Student an appropriate IEP or special education program for the 2012-2013 school year.  The interventions that were offered in writing in the IEP were not reasonably calculated to provide Student with an opportunity for meaningful educational benefit.  The interventions offered for reading failed to address Student's reading needs appropriately, and were essentially the same interventions that had failed to help Student make meaningful progress for the previous five years.  The IEPs did not offer interventions to address Student's needs in writing.  The interventions for mathematics failed to offer Student access to the seventh grade curriculum, failed to offer to address all of Student's needs, and failed to offer a systematic and sequential approach to instructing Student in areas of educational need.   Because the special education program failed to address all of Student's needs appropriately, I conclude that the offered IEPs were inappropriate.  Even considering the lengthy oral explanations offered by District witnesses concerning what their program would have provided, I find that the offered program failed to offer a FAPE to Student.

Reading

The interventions for reading failed to come to grips with Student's serious auditory processing disorder.  The IEPs did not offer direct, systematic, research-based instruction to address Student's phonological weakness and lack of decoding skills.   The District's expert testified that the District considered Student too old to be instructed by means of a systematic, sequential and multi-sensory program of phonics instruction, such as the research-based programs known to him.  He offered the opinion that the District should teach Student reading by teaching whole word recognition skills.  He asserted that there is no research basis for teaching phonics systematically to a child over the age of nine; however, Parents' expert credibly testified

that there is substantial research basis showing that such instruction is likely to provide an opportunity for meaningful progress.  (NT 699-701, 766-767, 799-800.)[6]  Moreover, the program offered for the 2012-2013 school year was substantially the same as that offered in previous years, and Student had made virtually no progress in reading during those years.  Therefore, I conclude that the approach proposed by the District was not reasonably calculated to provide Student with meaningful progress in reading.

The program set forth in the IEP is not systematic or sequential.  The IEPs offered no single research based program of that nature.  They offered no indication that there would be a systematic method of progress monitoring.  Instead, the IEPs referred to a computer-based program that was implemented in the school library, without the special education teacher's presence during instruction.  While Student was at the middle school, the entire software program had not been installed, and was not accessible to the teacher.  The program itself had been used with Student in the previous school year, and had proven frustrating to Student.[7]

The District did offer to increase the amount of time that Student would have spent in the resource room for reading and mathematics.  This would have given Student a Supplemental level of learning support, but that level is described in the IEP does not assure Parents of any minimum level of resource room time, nor was there any substantial evidence in the record showing that the District was able to be more definitive.  In the resource room, the program

---

[6] In addition to this credible refutation of his central thesis, the District psychologist's testimony was inconsistent in several respects with his own written reevaluation report.  While I found the psychologist very well qualified and credible, I assigned less weight to his testimony because of these considerations.

[7] I conclude that the failure to provide the full computer program that the District itself decided to continue for Student in seventh grade shows an inappropriate level of disorganization in Student's program, and raises a reasonable doubt that the District was prepared to deliver even its chosen reading intervention with fidelity.

being offered was not systematic or sequential, as discussed above, and was not appropriate for Student's needs.

The IEP provided for one reading goal and three objectives that addressed both fluency and comprehension.  The goals were set at a facially low level of achievement, and did not proceed intelligibly from baselines, so that it was impossible to tell whether or not the goals were calculated to measure progress.  There were no goals for decoding, whole word recognition, sight word vocabulary, encoding or spelling.  While it could be argued that a fluency goal measures the growth of these skills, the Student's reading disability is so severe and the Student is so far behind in reading that all of Parents' experts agreed that the goals should have addressed the constituent skills of reading individually, rather than simply positing a fluency goal as in the offered IEP.  The District's peculiar computer program, which does not print baselines for goals and which does not preserve progress data for parents' perusal,  virtually excluded Parents from meaningful understanding of the offered IEPs, despite the requirement of the IDEA that parents be real members of the IEP team.

There was no evidence of any progress monitoring in the previous years.  The District argued that baselines were in the IEP available to teachers, but would not print out.  There was also testimony indicating that progress data had been destroyed when the Student's teacher retired; this information came to light in the midst of the hearing.  While I do not take an adverse inference from these facts, I conclude that there is no credible evidence that District personnel performed or promised to perform progress monitoring – an essential element of any IEP and an essential indicator of program integrity.

Mathematics

The October 22, 2012 IEP was not reasonably calculated to provide Student with meaningful gain in education.  It did not indicate at what grade level Student was expected to perform in pursuit of the single mathematics goal.  It did not specify the instructional program to be provided, eliminating the explicit reference to program that had appeared in the June 2012 goal.  The assessment method was also eliminated, with the effect of further obscuring how the goals would be monitored.  The IEP did not address Student's recognized educational needs in division.  Baselines were unintelligible, as with the reading goal, and I conclude that there was no credible evidence that progress monitoring had occurred or was reasonably promised for this Student[8].

Writing

The IEP did not offer any specially designed instruction to Student with regard to either the conventions of writing or its content.  Yet the record demonstrates that Student's educational needs included encoding[9] and writing skills.  Because the offered IEP did not address all of Student's educational needs, as required by the IDEA, discussed above, I conclude that it was inappropriate.

---

[8] This is based upon the same facts with regard to baseline and progress monitoring records that pertain to reading, as explained above.  Thus it was reasonable for Parents to conclude that it was not offered as part of the District's program for Student.  Moreover, the record is preponderant that Student made little progress in the District's programs in previous years; thus the District's track record reasonably would have undercut the Parents' confidence that the District's unspecific programming promises would be likely to succeed in the 2012-2013 school year.

[9] The IEP offered specially designed instruction that required spelling instruction to be linked to decoding instruction.  However, the IEP offered no assurance that there would be meaningful decoding instruction, as discussed above.

Supplementary Aids and Services

The IEP did not specify how the regular education curriculum would be modified to enable Student access to the seventh grade curriculum in science and social studies. There was no mention of co-teaching or one to one paraprofessional support. There was evidence that both techniques had been utilized in science and social studies classes when Student was in grade school. This offered no reasonable assurance to Parents, whose child had now transferred to a middle school. As these elements of specially designed instruction were needed, based upon a preponderance of the evidence, but were not offered through the IEP, I conclude that it was inappropriate.

Speech and Language

I do not conclude that the District failed to offer an appropriate speech and language program in the IEP. Parents complained that the District did not offer enough hours of speech and language therapy – either direct services or consultative services. However, they base this argument upon an expert's report that the District countered with their own speech and language therapist. Both of these dueling experts were credible, and neither possessed such superior credentials or factual foundation as to tip the balance of the evidence against their counterpart.

In addition to weighing the opinion testimony to equipoise, I consider that the IEP goals drafted by the District's speech and language therapist in the October 22, 2012 IEP were much clearer and more comprehensive than those drafted for reading, mathematics or writing. In response to Parents' private evaluation report, the District increased the hours of direct service by 100 per year, promised unlimited speech therapy consultation services to teachers, reformulated the speech and language goals and objectives, and added specially designed

instruction.  The reformulated goals improved measurability, and added areas to be addressed in therapy, which in the final offer included articulation, auditory memory, labeling, similarities and differences, expressive and receptive language skills, sentence comprehension and passage comprehension.  Specially designed instruction was added to improve visual support for auditory therapy activities.  The revised IEP addressed all or most of the areas of need identified by the private evaluation report.

Parents argue that the District should have paid for a more thorough audiological examination instead of relying upon an audiological screening that Parents had provided.  While I agree with them that, on this record, it appears at least reasonable to argue that the testing should have been conducted by the District at public expense, this does not render the offered IEP inappropriate.

On this record, the District had reason to believe that Student needed a more thorough audiological evaluation in September 2012.  There is no suggestion that the District should have waited for a more thorough audiological examination before offering the speech and language part of the IEP.  Rather, Parents are arguing that the District should have been able to produce an IDEA compliant IEP within ten days of Parents' notice that they planned to unilaterally place Student.   Thus, any argument that the District's position was inappropriate regarding audiological evaluation can have no effect on my decision as to the appropriateness of the IEP that the District provided within ten days of notice.  Moreover, the similarity between the District's October 22, 2012 IEP and the special education services recommended by the Parents' expert shows irrelevance of the missing audiological evaluation to the issues in this matter.

Postsecondary Transition

Parents argue that the transitional services offered to Student in the October 22, 2012 IEP were inadequate.  However, Student was [not yet fourteen] at that time.  Thus, the District was not yet obligated to produce a comprehensive transitional plan, although it would be so obligated once Student turned 14 during the term of the offered IEP.  Moreover, the exploration of post-secondary goals is normally a starting point for transition planning, and the offered IEP did address that first step.  I conclude that the transition provisions were not inappropriate at the time at which they were offered, especially in light of the fact that they could have been amended when Student turned 14 years of age [redacted].

THE PRIVATE SCHOOL PLACEMENT WAS APPROPRIATE

I conclude that the private placement chosen by the Parents for Student was appropriate.  A unilateral placement does not have to be the equivalent of that provided by a competent local education agency under the IDEA.  A private placement's failure to meet state education standards is not a bar to tuition reimbursement.   34 C.F.R. §300.148(c); Lauren W. v. DeFlamminis, 480 F.3d 259, 276-277 (3d Cir. 2007).  The private placement only needs to provide significant learning, confer meaningful benefit, and provide the least restrictive environment appropriate to address the Student's needs.  Munir v. Pottsville Area Sch. Dist., 2013 U.S. App. Lexis 15129 (3d Cir. 2013); Lauren W., above at 276-277.  I conclude that the School meets these requirements.

A preponderance of the evidence in this record proves that the School is providing significant learning and is meeting all of the Student's educational needs.    The director of the School testified to this effect, as did the Parents' expert school psychologist, who personally

assessed the services and programs that the School was delivering to Student.  Based upon their testimony as well as documents in evidence showing progress that Student is making, I conclude that the School's program is addressing Student's reading, spelling and writing needs comprehensively.   It is also addressing Student's mathematics needs, and it is properly accommodating Student's needs to access the curriculum in science and social studies.  Student's speech and language needs are being addressed through qualified speech and language therapy services that Parents have obtained.

The evidence shows that Student is making progress in reading, mathematics, writing and Student's other subjects.  Therefore, the School is conferring meaningful benefit to Student.

The District argues that the School does not provide the least restrictive environment.  I find that the preponderance of the evidence contradicts this argument.  Parents produced multiple credible witnesses who offered expert opinions that the Student needs to be taught in a small setting through an explicit, systematic program of reading instruction that incorporates multisensory instruction in phonics and comprehension.   Consistent with this testimony, the evidence also shows that Student failed to make appropriate progress in reading and mathematics over the five years of Student's enrollment in the District, which offered a less restrictive environment.   Based upon a preponderance of the evidence in this matter, I conclude that the Student presently needs the small setting and explicit teaching program provided by the School, despite its more restrictive nature.  Indeed, the District appears to have intended, based upon its last offered program, to provide a resource room setting for Student for almost the entire school day; thus, even the District appeared to agree that at present Student needed a very large amount of non-inclusive programming.  Thus, I conclude that the School's program is not inappropriate because of the least restrictiveness mandate.

24

THE EQUITIES FAVOR TUITION REIMBURSEMENT

The District argues prominently that the equities favor the District because the Parents "predetermined" a private placement before the District offered a changed IEP in October 2012, and that the Parents only gave the middle school ten days to fix any deficiencies in the IEP, an unreasonable demand.  I find that the equities favor tuition reimbursement.

The evidence is preponderant that the Parents did not "predetermine" a private placement before they met with middle school officials to air their concerns about the IEP.  On the contrary, the record shows that the Parents expected Student to transition to the middle school, and did all the things that one would expect them to do to facilitate the transition while guarding the wellbeing of their child.  Parents worked patiently to iron out problems at the beginning concerning Student's transportation and locker assignment.  Within weeks, however, Student came home with a note suggesting that the assigned teacher did not understand Student's language based learning disability and was not following Student's IEP.  Only then did Parents request a meeting to make sure that the District had properly transitioned Student's IEP to the new school.  Nothing in this suggests that Parents had predetermined a private placement.

The District argues that the Parents too quickly gave notice that they would unilaterally place Student, since it was only a matter of days after the first meeting.  However, the evidence shows that the Student had not made much progress in reading, writing and mathematics for five years of enrollment in the District.  Early in the new school year, there was serious concern that the District was not providing services in the IEP to Student.  Parents had concerns anyway about the appropriateness of the IEP and had just settled a due process complaint about past FAPE issues.  In addition, Student was developing anxiety about school and Parents felt the need

to move quickly.  I conclude that the Parents' impatience with the middle school was not unjust or unreasonable under the circumstances.

I note that the IDEA speaks in terms of the parent's legal relationship with the local educational agency – not with the local school operated by that agency.  Parents appropriately saw their complaint as being against the District, because the District was responsible for providing the services that Student needed.  I conclude that, in the circumstances of this matter, the Parents were not under an equitable obligation to the middle school staff.  It was the District that they were obligated to treat fairly.

The IDEA regulations define what "fairly" means in this regard.  The regulations provide that a hearing officer "may" reduce or deny reimbursement if the parents failed to inform the IEP team of their rejection of the placement, their plan to enroll the child in a private school, and their salient concerns; or, if the parents do not give the agency such notice at least ten business days prior to removal of the child from the agency's schools.  34 C.F.R. §300.148(c).  Thus, I conclude that the IDEA sets a minimum amount of time for notice to the agency, and if the parents give less than this notice, the hearing officer is authorized, but not required to modify any otherwise merited tuition reimbursement.  I take this as guidance in exercising equitable discretion in the present matter.  I conclude that the Parents did not deprive the District of the notice that the IDEA sets forth as a guideline for what is fair and equitable.  Thus, I find no equitable basis for reduction of reimbursement.

The District does not come to equity with clean hands.  Twice, the duly authorized representative of the District, the special education liaison, misinterpreted the law in a way that led Parents to believe that the District had no intention of materially altering its offered IEP to address their concerns.  First, at a meeting, the liaison asked Parents why the District should

develop an IEP when it knew that the Parents planned to place Student in a public school; the answer is that the ten days' notice is for the very purpose of giving the District a chance to come to a meeting of minds with the parents, and the District has an obligation to offer a FAPE. Second, the liaison wrote to Parents to advise them that the District would not provide an IEP unless and until the Parents agreed with the October 31 reevaluation report.  Plainly, a district can provide an amended IEP without reevaluation, and parents are under no legal obligation to agree with a reevaluation report under any circumstances.  Given its above representations to Parents, the District cannot cry foul because the Parents gave them a few days more than the minimum notice that the IDEA suggests is fair.

In sum, the Parents have proven by a preponderance of the evidence that the District failed to offer Student a FAPE, that they chose an appropriate private placement, and that it is equitable for the hearing officer to order tuition reimbursement.  Therefore, I will order such reimbursement.


COMPENSATORY EDUCATION

For all of the reasons set forth above, I conclude that the District failed to provide Student with a FAPE during the period in which Student attended the middle school in 2012, from September 21, 2012 until October 31, 2012[10], before Parents withdrew Student from the District.  Therefore, I will order the District to provide Student with compensatory education. Because the District's failure to provide a FAPE was in multiple academic subjects, and because

---

[10] There was insufficient evidence from which to determine what Student's progress would have been during this relatively brief period, if provided with a FAPE.  Thus, there is no record basis for a make-whole compensatory education order, Marple Newtown School District v. Rafael N., No. 07-0558, 2007 U.S. Dist. LEXIS 62494 (W.D. Pa. 2007).  I therefore will measure the order on an hour by hour basis.

its failure to provide appropriate reading intervention affected Student's performance in all other subjects, I will calculate the compensatory education in full days[11].  In addition, I will add speech and language hours to the order for compensatory education as Parents request, because I conclude that the District's IEP for speech and language services in June 2012, which governed Student's education until amended by the October 22, 2012 IEP, failed to provide Student with a FAPE from September 21, 2013 until October 22, 2012, when the District amended the IEP to meet the requirements of a FAPE.

SECTION 504 AND ADA

I conclude that the District, which violated the IDEA by failing to offer a FAPE, also violated its obligations not to discriminate on account of handicap under section 504[12] and the ADA.  Based upon the record in the present case, the District failed to make an offer that was reasonably calculated to provide meaningful educational benefit in the areas of reading, writing and mathematics.  I conclude that this failure was also a failure to design Student's education in order to meet Student's individual needs as adequately as the needs of non-handicapped children in the District are met.  34 C.F.R. §104.33(b)(1).

The evidence is preponderant that the District's offered special education services were not reasonably calculated to meet Student's educational needs, while same age peers' educational needs were being met at a higher level of curriculum.  Student was achieving at a grade level far below that of Student's same age peers in the District's middle school in the areas of reading, writing and mathematics.  Student was unable to keep up with classes offering the

---

[11] These will be 6.5 hours per day, based upon the school day reported in the October 22, 2012 IEP.  (S 16 p. 35.)

[12] The parties have stipulated that the District is federally funded, that Student has a handicap within the meaning of section 504, and that the Student is "otherwise qualified" for section 504 purposes.  (NT 41-42.)

seventh grade curriculum because Student could not read. Student was embarrassed to participate in classes because of Student's low level of academic functioning. Parents' experts produced credible and reliable testimony that Student could function at a higher level academically, and Student's performance at the School corroborates that testimony, as Student was making progress there. Thus, while same age peers were given the instruction they needed to make meaningful progress, Student was not offered the instruction that Student needed to make meaningful progress. This violated section 504 and the ADA in this matter.

The Parents concede that their claim is limited to what is "derivative" of the IDEA claim. They do not seek any relief under section 504 and the ADA in addition to what I can order under the IDEA. Therefore, no other or additional relief will be ordered pursuant to section 504 or the ADA.

<u>CONCLUSION</u>

I conclude that the District failed to offer a FAPE within the meaning of the IDEA, section 504 and the ADA. I order the District to provide both tuition reimbursement for the tuition and fees paid for Student's attendance for most of the 2012-2013 school year, and compensatory education for the brief period during which Student was enrolled in the District's school in the 2012-2013 school year, as limited by the relevant period stipulated by the parties.[13] Any claims regarding issues that are not specifically addressed by this decision and order are denied and dismissed.

_____

[13] I have considered whether or not these awards overlap impermissibly. Student spent some days with the District in September and October 2012 before entering the School. The record does not clarify whether or not the School's tuition charges were prorated for the initial part of the school during which Student was not enrolled. Nevertheless, the full year tuition was paid out of a compensatory education fund, thus depleting resources available to Student. I conclude that this is not a "double dipping" situation, and that the compensatory education and tuition reimbursement orders do not overlap. Thus, both orders together will restore to Student the services of which Student was deprived, but only once.

<u>ORDER</u>

1. During the period from September 21, 2012 to October 31, 2012, the District failed to offer to and provide Student with a FAPE, in violation of the IDEA, section 504 and the ADA.

2. The private placement selected by Parents was appropriate.

3. It is equitable to order the District to reimburse Parents for private school tuition and fees for the 2012-2013 school year.

4. I hereby order the District to reimburse Parents for the tuition, fees and costs that they caused to be paid to the [private] School for Student's enrollment in the 2012-2013 school year; these expenditures are stated in full at Parents' Exhibit 3, page 1.

5. Parents may elect whether or not to replenish any compensatory education fund, held by the District, from which the 2012-2013 [private] School tuition and fees were paid.   In the alternative, Parents may elect to receive the tuition reimbursement directly.

6. I hereby order the District to provide compensatory education to Student for every school day on which Student was present at Student's assigned school from September 21, 2012 through October 31, 2012.   Compensatory education shall be provided in the amount of 6.5 hours for every school day from September 21, 2012 to October 31, 2012, plus one hour for every school week or partial school week during the period from September 21, 2012 through October 22, 2012.

7. Compensatory education shall be provided in the form of any remedial or instructional service that addresses Student's educational needs.   Services shall be provided by instructors selected by Parents and qualified to provide the services described above.   The cost of such services shall be limited to the comparable cost that the District would incur to provide such services through qualified instructors or related services providers, including salary and benefits.   The services may be provided at any time, including after school hours or in the summer, until Student reaches 21 years of age.   The services may be reduced to a monetary value and held in any fund by agreement of the parties.

*William F. Culleton, Jr. Esq.*

WILLIAM F. CULLETON, JR., ESQ., CHO
HEARING OFFICER

September 22, 2013

30